IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| DWG HOLDING COMPANY LLC; a Washington limited liability company; and DENNY WANG, an individual, | No. 86893-4-I |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| DECATHLON ALPHA, III, L.P., a Delaware limited partnership, | |
| Respondent. | |

BOWMAN, A.C.J. — DWG Holding Company LLC and Denny Wang appeal the trial court orders dismissing their breach of contract claim, granting summary judgment for Decathlon Alpha III LP's breach of contract counterclaim, and awarding Decathlon attorney fees. Because no genuine issues of material fact remain and Decathlon is entitled to judgment as a matter of law, we affirm.

FACTS

GAEMS and Decathlon

In 2010, John Smith and Dean Mercier founded G.A.E.M.S. Inc. (GAEMS), a technology and mobile gaming company based in Redmond. GAEMS designed accessories for video game consoles such as Nintendo, Xbox, and PlayStation. It specialized in portable monitors for the gaming systems. One of their primary products was the "GAEMS M155."

In 2015, Wang joined the company as a partner. In 2016, Wang purchased GAEMS through his company, DWG Acquisition Company LLC (DWG Acquisition). In 2017, GAEMS underwent a corporate restructuring. Smith and Mercier relinquished ownership but stayed with the company as managers.[1]

Decathlon is a fund owned by a financing firm that specializes in growth funding. In June 2017, Decathlon and GAEMS executed a "Revenue Loan and Security Agreement" (RLSA). Decathlon loaned GAEMS $1.6 million, secured by an interest in all present and future acquired property of GAEMS, including intellectual property. As a condition of the RLSA, Decathlon required a group of separate GAEMS investors, the "Wang Group,"[2] to subordinate its loan to Decathlon's loan. In completing the loan process, Decathlon vetted GAEMS using its "standard due diligence checklist."[3]

In October 2018, GAEMS executed a "Distribution Agreement" with Protempo Limited. Under the agreement, Protempo developed tooling for GAEMS products and received exclusive licensing and distribution rights. In exchange, Protempo agreed to pay GAEMS a percentage of its revenue from product sales.

Between 2017 and 2022, Wang, Mercier, and Smith had a management dispute over GAEMS that resulted in "contentious litigation." In April 2019,

---

[1] Whether Smith and Mercier completely relinquished their ownership became the subject of a 2018 lawsuit filed by Wang.

[2] The Wang Group is a group of individuals that had also loaned GAEMS money.

[3] The checklist identified about 40 documents and other company-specific materials that Decathlon would review before approving a loan. Decathlon would typically set up a Dropbox account and ask company representatives or operating executives to upload materials to the account.

Decathlon intervened in the litigation to "protect its interests when it became clear that the Wang Group disclaimed the validity of the subordination agreement signed by Mr. Wang in 2017."

In 2021, GAEMS products were losing compatibility with changing technology. Protempo's payments became "erratic," and GAEMS could not cover its operating expenses. Ultimately, the court appointed a general receiver to manage GAEMS' finances. In February, Decathlon filed a "Proof of Claim" with the receiver for over $6.6 million for repayment of its loan to GAEMS. The receiver attempted to secure a buyer for GAEMS but could not, as the Protempo Distribution Agreement restricted the use of most of the tooling to ramp up sales. To further complicate matters, Protempo gave much of the GAEMS tooling to Jetway, a foreign manufacturer. Meanwhile, Wang formed DWG Holding Company LLC (DWG). DWG's "purpose was to acquire all GAEMS loan rights held by Decathlon."

On March 19, 2021, Decathlon and GAEMS[4] entered into a "Mutual Release and Settlement Agreement" (Settlement Agreement). In exchange for $1.3 million, Decathlon agreed to dismiss its lawsuit against Protempo or other third parties, dismiss its Proof of Claim, and assign all its rights under the RLSA to DWG. As security for the payment, Wang executed a deed of trust in favor of Decathlon for real property located in Bellevue. DWG agreed to make quarterly payments of $150,000 to Decathlon beginning October 15, 2021.

---

[4] The contract lists the GAEMS parties as "Chengdu Gaishi Electronics, Ltd.; Zhizheng Wang individually and for the Wang Group and Wang Lender Group, QiQi 'Denny' Wang, Le Li, and DWG Holding Company, LLC."

In April 2021, Decathlon and DWG drafted a formal assignment of Decathlon's rights and interests under the RLSA. During the negotiation of the document, DWG proposed adding a cooperation provision to the draft assignment. The parties chose not to include that paragraph in the final "Assignment Agreement, Assignment of Receivership Proof of Claim, and Bill of Sale" (Assignment Agreement).

Under the Assignment Agreement, Decathlon

assign[ed], transfer[ed], convey[ed], and [sold] to [DWG] all of [its] right, title and interest in, to, and arising out of, claims and rights related in any way to the RLSA and Proof of Claim, including pledged collateral, as well as any and all rights it has to bring any form of litigation against Protempo, domestically or internationally, or any other third-parties relating to the [Decathlon] Rights set forth in the Settlement Agreement, without recourse, representation or warranty of any kind except as set forth in the Settlement.

Decathlon also discharged all duties, liabilities, and obligations against DWG in connection with the RLSA. And the Assignment Agreement stated that it

contains the complete agreement of the parties and supersedes any prior agreements, whether written or oral, between them with respect to the Loan Documents, except that this Agreement does not supersede the March 19, 2021 Settlement Agreement entered into by [Decathlon] and [DWG], and is instead intended to memorialize the assignment of rights discussed in that Settlement Agreement. To the extent this document and the Settlement Agreement conflict in any way, the terms of the Settlement Agreement supersede this Agreement and controls the relationship between the Parties. This Agreement may not further be modified or amended except by a writing signed by the Parties hereto.

In May 2021, the general receiver terminated the receivership. In June, DWG foreclosed on the GAEMS collateral assigned by Decathlon. It then tried to

extract GAEMS from the Distribution Agreement with Protempo and demanded Protempo turn over all the GAEMS tooling equipment.[5]

In July, Wang and DWG's (collectively DWG's) counsel, Benjamin Ellison, e-mailed Decathlon's attorney, seeking documents to assist DWG in its litigation with Mercier and Smith. Ellison stated:

> My client is looking forward to commencing payments under the purchase agreement with your client soon.
>
> However, this is complicated somewhat by [Mercier and Smith's lawyer]'s very recent claim that the RLSA is not properly guaranteed by DWG [Acquisition] and that Decathlon conducted insufficient due diligence in determining that DWG owned GAEMS.
>
> To facilitate our mutual clients' best interests, could you share the due diligence documents provided historically establishing that DWG [Acquisition] owns GAEMS? [The lawyer]'s 11th hour argument is that Mercier and Smith own GAEMS, despite representations to the contrary in the RLSA.

On July 30, Ellison clarified the request, saying, "I guess I am asking for a copy of the due diligence materials shared by GAEMS with Decathlon in making the loan."

On August 26, 2021, Decathlon's attorney responded to Ellison, saying:

> I verified that there are [no] additional due-diligence records that were not disclosed. Is there some specific document that you believe should exist? If so, I am happy to ask for Decathlon to look for that. But at this point, we don't believe there are other due-diligence documents.

In response, Ellison asked Decathlon for the "documents GAEMS forwarded/ uploaded to Decathlon in order to gain approval for moving forward with the loan." And he requested that if Decathlon believed it had disclosed those

---

[5] This resulted in protracted litigation between GAEMS and Protempo.

documents, to "specify which documents constitutes this due diligence batch." Decathlon's attorney directed Ellison to a 761-page "bates range of documents" produced during their litigation.

In September 2021, Ellison asked which documents were " 'uploaded' " by GAEMS before execution of the loan. Decathlon's counsel responded, saying:

> Since none of us have reviewed the documents in over a year, we are not able to say whether or where documents pertaining to the representations of ownership would be. Any such representations would likely be part of the loan documents, and if the issue of ownership came up, those communications would be in the production.
>
> I am running this up the flagpole to see if it is something I can easily find for you. However, if I understand your question correctly, it seems as if you are simply asking us to review documents relevant to your case for you, and it is ultimately unfair (and not our responsibility) to do that.

On October 15, 2021, DWG failed to make its first $150,000 payment to Decathlon as required under the Settlement Agreement. Decathlon notified DWG that it was in default. Then, DWG did not pay the second installment due on January 15, 2022. Decathlon again notified DWG that it was in default. Still, DWG made no payments. So, on April 18, 2022, Decathlon started a nonjudicial foreclosure on the Bellevue property deed of trust. The foreclosure sale was set for August 26, 2022. The day before the sale, Decathlon agreed to postpone the foreclosure sale on the condition that DWG pay $55,000. DWG paid Decathlon $55,000, and Decathlon postponed the sale.

<u>UpSwitch</u>

Beginning in 2020, Smith, Mercier, and Decathlon's managing partner John Borchers launched another business venture, Up Switch LLC (UpSwitch).

6

UpSwitch manufactured a gaming product called the Orion.  The Orion is a handheld product that integrates with the Nintendo Switch gaming system.

Smith applied to trademark UpSwitch through his company, Lucid Technology Holdings LLC.  And UpSwitch's certificate of formation listed Smith and Mercier as general managers and Borchers as the sole elected board member.

### Procedural History

On September 29, 2022, DWG sued Decathlon for breach of contract.  It amended its complaint on October 21.  DWG alleged Decathlon violated its duty of good faith and fair dealing by failing to cooperate post-Settlement Agreement with DWG's requests for "aid and support."  And it claimed Decathlon "aided and abetted a new commercial competitor" to GAEMS by investing in UpSwitch.[6]  Decathlon counterclaimed, alleging that DWG breached the 2021 Settlement Agreement by failing to make the agreed payments.  Decathlon asked for attorney fees and costs under the Settlement Agreement's indemnity clause.

In February 2024, Decathlon moved for summary judgment.  It argued that the Settlement Agreement did not require it to provide due diligence documents or prohibit it from investing in UpSwitch.  DWG acknowledged that no provision in the Settlement Agreement required Decathlon to provide documents, but it argued that Decathlon's lawyer assured DWG that "every reasonable courtesy would be extended to [DWG] post-execution" of the agreement, which led DWG

---

[6] DWG further alleged Decathlon breached its agreement to continue the foreclosure sale.  This claim is not at issue on appeal.

"to drop [a] formal" cooperation provision from the contract. And Decathlon's "oral assurances underscore the duty of good faith" it owed to DWG. DWG also argued that Decathlon's refusal to provide information, coupled with its business dealings with UpSwitch and Mercier, violated the duty of good faith and fair dealing because it materially impacted DWG's ability to perform under the contract and enjoy the benefit of its bargain.

On May 14, 2024, the trial court dismissed DWG's breach of contract claim with prejudice and entered summary judgment for Decathlon, ruling that DWG breached the Settlement Agreement by failing to timely make its installment payments. The court awarded Decathlon attorney fees and costs under the agreement's indemnity clause. On June 12, the court entered a final judgment against DWG of $1,283,974.62 plus postjudgment interest.[7] The same day, the trial court entered a supplement judgment for indemnity, awarding Decathlon an additional $425,000.00.

DWG appeals.

ANALYSIS

DWG argues the trial court erred by dismissing its breach of contract claim, granting summary judgment for Decathlon, and awarding Decathlon attorney fees and costs. Decathlon asks for attorney fees on appeal. We address each argument in turn.

---

[7] The court also dismissed without prejudice Decathlon's counterclaim as to defendants Zhizheng Wang, the Wang Group, and the Wang Lender Group because they were not served with Decathlon's amended answer. Those orders are not at issue here.

1. <u>Summary Judgment</u>

We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Kelley v. Tonda*, 198 Wn. App. 303, 310, 393 P.3d 824 (2017). Summary judgment is proper only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Vasquez v. Hawthorne*, 145 Wn.2d 103, 106, 33 P.3d 735 (2001). The moving party bears the burden of showing it is entitled to summary judgment. *Ross v. Bennett*, 148 Wn. App. 40, 49, 203 P.3d 383 (2008).

The trial court should not grant summary judgment unless "from all the evidence, reasonable persons could reach but one conclusion." *Vasquez*, 145 Wn.2d at 106. Even when the underlying facts are undisputed, summary judgment is improper if those facts can support reasonable but conflicting inferences. *Southside Tabernacle v. Pentecostal Church of God*, 32 Wn. App. 814, 821, 650 P.2d 231 (1982).

A defendant moving for summary judgment can challenge whether the plaintiff produced competent evidence to support the essential elements of their claim. *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285 (2019). The plaintiff must then provide sufficient evidence to support those elements. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P. 2d 182 (1989). The plaintiff may not rely on the allegations in their pleadings. *Id*. Rather, the plaintiff must respond with evidence setting forth specific facts to show that there is a genuine issue for trial. *Id*. at 225-26.

We consider all facts submitted and draw all reasonable inferences from them in a light most favorable to the nonmoving party. *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000). A party alleging breach of contract must show the contract creates a duty, the defendant breached that duty, and the breach proximately harmed the claimant. *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.,* 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

A. DWG's Breach of Contract Claim

DWG argues the court erred by dismissing its breach of contract claim because the evidence shows Decathlon breached its implied duty of good faith by refusing to cooperate in providing due diligence documents and otherwise preventing DWG from receiving the full benefit of its bargain.

Every contract carries an implied duty of good faith and fair dealing. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). Generally, this duty requires mutual cooperation so that each party "may obtain the full benefit of performance." *Id.* Parties to a contract must maintain " 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Edmonson v. Popchoi*, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (AM. L. INST. 1981)). But the implied duty of good faith and fair dealing does not impose a "free-floating obligation of good faith on the parties." *Rekhter v. Dep't of Soc. & Health Servs.,* 180 Wn.2d 102, 113, 323 P.3d 1036 (2014). Rather, the duty arises in connection with only the terms agreed to by the parties. *Id*. And the duty cannot add or contradict express contract terms. *Id*.

i. Duty to Cooperate

DWG argues that Decathlon promised it would cooperate with DWG in providing information to implement the purpose of the Assignment Agreement. And it contends Decathlon breached that promise by failing to respond in good faith to DWG's request for due diligence documents. We disagree.

To determine whether Decathlon breached a duty related to cooperation, implied or otherwise, we must first determine whether the duty to cooperate was a term of the Assignment Agreement. We interpret the terms of a contract de novo. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). In doing so, we try to determine the parties' intent by focusing on the objective manifestations of the contract rather than on the unexpressed subjective intent of the parties. *Hearst Commc'ns Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Clear and unambiguous contracts are enforced as written." *Grey v. Leach*, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).

Here, the Assignment Agreement states that its purpose is to enable DWG "to assert and collect on and enforce all of [Decathlon]'s rights relative to [GAEMS] and the RSLA . . . , including but not limited to the ability to foreclose on certain collateral." And to accomplish that goal, Decathlon "assigns, transfers, conveys, and sells to [DWG] all of [its] right, title and interest in, to, and arising out of, claims and rights related in any way to the RLSA and Proof of Claim, including pledged collateral," as well as any rights it has to bring litigation against

other parties related to the Settlement Agreement. No term in the Assignment Agreement asserts a promise by Decathlon to assist DWG postassignment.[8]

Still, DWG argues Decathlon's attorney made an "implied promise" to assist it postassignment. DWG points to a proposed contract term and the lawyers' discussion about the term. But the record does not support DWG's argument.

While negotiating the terms of the Assignment Agreement, DWG proposed adding a cooperation provision that said:

> Duty of Cooperation: Each Party agrees that from time to time it will execute and deliver all further instruments and documents, share information, and take all further action, that may be necessary or desirable, or that the other Party may reasonably request, in order to perfect and confirm the assignment effected by this Assignment, or to implement the purpose thereof.

During his deposition, attorney Ellison testified that in response to DWG's proposal, Decathlon's attorney said:

> You don't need language in this agreement that promises X, Y, or Z. You just need to pick up the phone and say, ". . . [W]e need this document. . . . [T]his issue has come up." [Decathlon's attorney] said, "It will be run up the flagpole super fast. It'll be resolved. It can all be done informally, and you don't need a written protection."

So, DWG dropped the cooperation provision from the final Assignment Agreement.

---

[8] DWG points to language in the Settlement Agreement requiring Decathlon to "execute any further documents that are reasonably necessary to effectuate this assignment and sale." But Decathlon's duty to execute documents to effectuate the assignment and sale of GAEMS assets to DWG does not amount to a duty to provide documents to aid DWG in a separate lawsuit.

Citing *State v. Trask*, 91 Wn. App. 253, 957 P.2d 781 (1998), DWG argues that these "oral assurances give rise to an implied promise," binding Decathlon to comply with the assurances in good faith. But *Trask* is inapt here.

In *Trask*, the State pursued Russell Trask's land under eminent domain and asked him to stipulate to an order of immediate possession. 91 Wn. App. at 259. He agreed, and the parties entered a stipulated order, but Trask did not timely deliver possession of the property. *Id.* at 259-61. The parties resolved the issue at trial, but the court refused to award Trask attorney fees because his timely delivery of possession of the property was a condition precedent to an award of fees. *Id.* at 261-62. On appeal, Trask argued that "the State affirmatively promised to help him move by providing and expediting relocation benefits" and that the State breached its promise, which prevented him from complying with his obligation to timely deliver the property. *Id.* at 273. Division Two of our court concluded that even assuming the State made such a promise, Trask did not otherwise show he was entitled to attorney fees. *Id.* at 274-76.

The *Trask* court assumed without deciding that the parties agreed to a binding oral promise—the State would pay relocation benefits. 91 Wn. App at 273. But here, DWG points to only an oral representation made outside the written terms of the Assignment Agreement. And the Assignment Agreement states that it "contains the complete agreement of the parties and supersedes any prior agreements, whether written or oral, between them with respect to the Loan Documents." So, any agreement, oral or otherwise, not contained in the

13

assignment does not amount to a binding promise and cannot give rise to a duty of good faith.

Still, citing *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990), DWG argues that the court should have considered the proposed cooperation provision as "parol evidence" of the true intent of the parties. But the "parol evidence rule" applies to only a writing intended by the parties as an integration of their agreement, i.e., " 'a writing intended as a final expression of the terms of the agreement.' " *Id.* at 670 (quoting *Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986)). Parol evidence is not admissible to " 'add to, subtract from, vary, or contradict written instruments which are contractual in nature and which are valid, complete, unambiguous, and not affected by accident, fraud, or mistake.' "[9] *Id.* (quoting *St. Yves v. Mid State Bank*, 111 Wn.2d 374, 377, 757 P.2d 1384 (1988), *overruled on other grounds by Berg*, 115 Wn.2d 657). We decline to use parol evidence to add a duty of cooperation to the parties' integrated agreement.

DWG has not shown that Decathlon breached its implied duty of good faith by failing to cooperate.

### ii. Benefit of the Bargain

DWG argues that even if Decathlon had no duty to cooperate under the Assignment Agreement, it still breached its duty of good faith and fair dealing by undermining the purpose of the settlement documents as a whole. We disagree.

---

[9] While DWG suggests that Decathlon deceived it into dropping the duty of cooperation provision from the final Assignment Agreement, it does not argue on appeal that accident, fraud, or mistake induced the assignment.

According to DWG, Decathlon interfered with its ability to enjoy the benefit of its bargain because Decathlon (1) refused to provide due diligence documents to help DWG defend against Mercier and Smith's lawsuit and (2) funded UpSwitch, a competitor to GAEMS. DWG argues that Decathlon's actions forced it to engage in contentious litigation with Smith and Mercier and contributed to its inability to profit from the assigned rights and collateral. But DWG misconstrues the nature of its benefit from the settlement documents.

Under the Settlement Agreement, the parties agreed that in exchange for $1.3 million, Decathlon would "sell all of its claims and rights related in any way to the RLSA and Proof of Claim" to DWG and assign to DWG "all rights it has to bring any form of litigation against Protempo" or other third parties related to those rights. So, the benefit of DWG's bargain was to resolve Decathlon's $6.6 million Proof of Claim, obtain all of Decathlon's rights under the RLSA, and obtain Decathlon's litigation rights.

Decathlon's actions, viewed in a light most favorable to DWG, did not interfere with any of those benefits. Decathlon dismissed its lawsuit and Proof of Claim and timely assigned its interests to DWG, and DWG foreclosed on the related collateral.[10] Decathlon had no obligation under the Settlement Agreement to assist DWG in its litigation with Smith and Mercier, to forgo investing in potential competitors, or to otherwise ensure DWG's success with its

---

[10] DWG argues for the first time on appeal that the Settlement Agreement is not valid because Decathlon misrepresented that it held a "perfected security interest" in GAEMS intellectual property and assets. Because DWG did not raise this issue to the trial court, we decline to address it. RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.").

newly acquired rights. So, Decathlon did not interfere with DWG's ability to enjoy the benefit of its bargain.

In sum, the court did not err in dismissing DWG's breach of contract claim.

B. Decathlon's Breach of Contract Counterclaim

DWG argues the trial court erred by granting summary judgment for Decathlon on its breach of contract counterclaim. We disagree.

Under the Settlement Agreement, Decathlon agreed to dismiss all existing litigation and assign GAEMS assets to DWG in exchange for $1.3 million. DWG agreed to make quarterly payments of $150,000 beginning October 15, 2021. Decathlon performed its obligations, but DWG did not pay its first $150,000 installment. And on January 15, 2022, it did not pay the second installment. Decathlon timely notified DWG of its defaults but DWG did not cure them. As a result, DWG breached the terms of the Settlement Agreement.

Still, DWG argues that its inability to make payments under the Settlement Agreement was a "direct result of Decathlon's bad faith actions." But as explained above, DWG has not shown that Decathlon acted in bad faith.

The court did not err by granting summary judgment for Decathlon.

2. Attorney Fees and Costs Below

DWG argues the court erred by awarding Decathlon attorney fees and costs under the indemnity clause of the Settlement Agreement. We disagree.

We review the reasonableness of an award for attorney fees for an abuse of discretion. *Gander v. Yeager*, 167 Wn. App. 638, 645, 282 P.3d 1100 (2012). A trial court abuses its discretion if no reasonable person would agree with its

decision. *See id.* at 652. The court may award attorney fees if the request is based on a contract or a statute. *Id.* at 645.

Here, under the Settlement Agreement's indemnity clause,

> [DWG] agrees to defend, indemnify and hold harmless [Decathlon] . . . . from and against any and all losses, claims, suits[,] controversies, liabilities and expenses (including, without limitation court costs, reasonable expenses of litigation and reasonable attorney's fees) arising, directly or indirectly, out of any breach of this Agreement, the Receivership Expenses, the RLSA, Proof of Claim, or the rights transferred hereunder; provided, however, that this indemnity shall be limited to those claims, rights, demands and causes of action arising from activity occurring on or after the Effective Date, except for the Receivership Expenses.

Because Decathlon incurred attorney fees and costs as a result of DWG's breach of the Settlement Agreement, the indemnity provision applies, and Decathlon is entitled to recover those fees and costs.

Still, DWG argues that material questions of fact remain about whether Decathlon acted in bad faith, so it is not entitled to indemnification. But again, as discussed above, there are no material questions of fact about whether Decathlon acted in bad faith. So, the court did not err in awarding Decathlon attorney fees and costs below.

3.  Attorney Fees and Costs on Appeal

Decathlon requests attorney fees and costs on appeal under the same indemnity clause and RAP 18.1. Under RAP 18.1(a), we may award attorney fees and costs on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses." Because this appeal arose from DWG's breach of the Settlement Agreement, the indemnity provision applies. We award reasonable attorney fees and costs to Decathlon in compliance with RAP 18.1.

17

In sum, because there are no genuine issues of material fact as to Decathlon's duty of good faith and fair dealing, we affirm the trial court's order dismissing DWG's breach of contract claim and granting summary judgment for Decathlon. And because Decathlon is entitled to attorney fees and costs under the Settlement Agreement's indemnity clause, we affirm the trial court's award of fees and costs below, and award Decathlon fees and costs on appeal under RAP 18.1.

_____, ACJ

WE CONCUR:

_____         _____
Coburn, J.                       Smith, J.